IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NIKKI D. KASSA,

        Plaintiff,

vs.                                            No. CIV 10-0933 JB/ACT

THE PLANS ADMINISTRATION
COMMITTEE OF CITIGROUP,
INC. and LIFE INSURANCE COMPANY
OF NORTH AMERICA,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Brief in Chief, filed February

21, 2011 (Doc. 30)("Motion"); and (ii) Defendant's Response to Kassa's Brief in Chief, filed March

17, 2011 (Doc. 33)("Response"). The Court held a hearing on April 27, 2011. The primary issues

before the Court are: (i) whether Defendant Life Insurance Company of North America ("CIGNA")[1]

correctly determined that Richard P. Kassa's death was not a covered loss, because a pre-existing

health condition, coronary artery disease -- not his accidental bodily injury, his fractured arm --

caused the death; and (ii) whether CIGNA correctly determined that an exclusion under R. Kassa's

Group Accident Policy No. OK 815669 ("Group Accident Policy") barred R. Kassa's accidental

dismemberment and death ("AD&D") benefits claim, because R. Kassa's coronary artery disease

caused the death. The Court concludes that CIGNA improperly denied Plaintiff Nikki Kassa's

---

[1] N. Kassa refers to Life Insurance Company of North America (CIGNA) as "CIGNA" -- because in the Health and Welfare Summary Plan Description for Coverage Effective January 1, 2008, at 101, filed March 14, 2011 (Doc. 32-2 at 8)("SPD"), the Claims Administrator is "Life Insurance Company of North America (CIGNA)"; the Defendants refer to Life Insurance Company of North America (CIGNA) as "LINA." The Court will follow N. Kassa's convention.

claim, and awards N. Kassa $30,000.00, pre- and post-judgment interest, attorneys' fees, and costs.

**FACTUAL BACKGROUND**

This case arise out of the Defendants refusal to pay benefits related to R. Kassa's death.  The facts, in summary are as follows.  N. Kassa was an employee of Citigroup Inc.  On September 4, 2008, N. Kassa's spouse, R. Kassa, fell in the family house and fractured his right humerus.  After a one-day hospital stay, R. Kassa was discharged to return home on September 5, 2008.  On September 6, 2008, R. Kassa died.  The parties dispute the cause of death.  N. Kassa contends that R. Kassa died from his injury; the Defendants contend that R. Kassa died from a heart condition unrelated to the injury.  N. Kassa submitted an AD&D benefits claim under the Group Accident Policy, see Insurance Claim (dated September 22, 2008), filed March 14, 2011 (Doc. 32-16), which Citigroup Inc. had obtained as part of its employee group health and welfare plan ("Plan").  CIGNA denied Kassa's claim and her appeal of its denial.  N. Kassa now seeks the policy amount of $30,000.00, an award of pre- and post-judgment interest, costs and attorney fees, and any other statutory or equitable relief the Court deems just and proper.

1.      **The Plan.**

The parties agree on many of the material facts upon which N. Kassa's claims are founded. The parties agree that the Employment Retirement Income Security Act ("ERISA") governs this case.  See Brief at 3; Complaint for Wrongful Denial of Accidental Death Benefits and Breach of ERISA Rights ¶ 1, at 1, filed October 1, 2010 (Doc. 1-1)("Complaint")(setting forth this fact); Amended Answer of PACC and LINA ¶ 1, at 1, filed January 14, 2011 (Doc. 22)("Amended Answer")(admitting this fact).  The Plans Administration Committee of Citigroup Inc. ("PACC") is the Plan Administrator of the Group Employee Benefit Plan of Citigroup Inc.  See Complaint ¶ 3, at 1-2 (setting forth this fact); Amended Answer ¶ 3, at 1 (admitting this fact).  CIGNA is the Claims

Administrator for PACC's Accidental Death and Dismemberment and Supplemental Accidental Death and Dismemberment Insurance Benefits, and is an insurance company authorized to do business in the State of New Mexico.  See Complaint ¶ 5, at 2; Amended Answer ¶ 5, at 2.  CIGNA is the Claim Administrator of the Group Accident Policy and funds benefits paid under the group policy.  See Complaint ¶ 6, at 2 (setting forth this fact); Amended Answer ¶ 6, at 2 (admitting this fact).

### a.    **The Summary Plan Description.**

PACC, as the Plan administrator, distributed to employees affiliated with Citigroup Inc. and its participating companies the Health and Welfare Summary Plan Description for Coverage Effective January 1, 2008, filed March 14, 2011 (Doc. 32-2 at 8)("SPD").  See Complaint ¶ 4, at 2 (setting forth this fact); Amended Answer ¶ 4, at 2 (admitting this fact).  On the inside cover of the SPD, under a headline in large type stating "Important information about the contents of this document," the SPD states it "is intended to be only a summary of the major highlights of" the various benefits of the plans that makeup the Plan.  The last paragraph on that same page states:

> No general explanation can adequately give you all the details of the Plans.  This general explanation does not change, expand, or otherwise interpret the terms of the Plans.   If there is any conflict between the SPD, or any written or oral communication by any individual representing the Plans, and the Plan documents (including any related insurance contracts), the terms of the Plan documents -- including any related insurance contracts as interpreted in the sole discretion of the Plan Administrator -- will be followed in determining your rights and benefits under the Plans.

SPD at i.  The SPD states that "AD&D pays a benefit if you are dismembered or die as a result of an accidental injury," SPD at 55, and that AD&D coverage is available for spouses and domestic partners, see SPD at 57.  The SPD further states that AD&D benefits "are provided under insurance contracts between Citigroup Inc. and the Claims Administrator."  SPD at 98.  The SPD refers

participants to "the Plan documents, which are available on the Benefits Book Online Web site" and

through a toll-free telephone number.  SPD at i.

> ### b.    **The Group Accident Policy.**

The Group Accident Policy provides the AD&D benefits available under the Plan.  The

Group Accident Policy states:

> **THIS IS AN ACCIDENT POLICY WHICH DOES NOT PAY BENEFITS FOR
> LOSS FROM SICKNESS.**
>
> . . . .
>
> [CIGNA] agree[s] to pay benefits for loss from bodily injuries:
>
>> a) caused by an accident which happens while an insured is covered by this
>> policy; and
>>
>> b) which, directly and from no other causes, result in a covered loss.  (See the
>> Description of Coverage).
>
> [CIGNA] will not pay benefits if the loss was caused by:
>
>> a) sickness, disease, or bodily infirmity; or
>>
>> b) any of the Exclusions listed in the Policy.

Group Accident Policy at 1 (bold in original).  The Group Accident Policy includes an exclusion that

provides: "No benefits will be paid for loss resulting from . . . Sickness, disease, or bodily infirmity.

(Bacterial infection resulting from an accidental cut or wound or accidental ingestion of a poisonous

food substance are not excluded.)"  Group Accident Policy at 3 ("Sickness Exclusion").

N. Kassa, as an employee of Citicorp Credit Services USA, an affiliate of Citigroup Inc.,

participated in certain employment benefits through her employment, including the Group Accident

Policy between PACC and CIGNA, which provided group dependent accidental death benefits.  See

Complaint ¶ 9, at 3 (setting forth this fact); Amended Answer ¶ 9, at 2 (admitting this fact).  At all

times relevant to this claim, N. Kassa was enrolled in the Basic Life/AD&D Coverage with PACC, as well as the spouse supplemental AD&D coverage under the Group Accident Policy.  <u>See</u> Complaint ¶ 10, at 3 (setting forth this fact); Amended Answer ¶ 10, at 2 (admitting this fact). R. Kassa, was insured under the Group Accident Policy at the time of his death on September 6, 2008.  <u>See</u> Complaint ¶ 11, at 3 (setting forth this fact); Amended Answer ¶ 11, at 2 (admitting this fact).  While N. Kassa was an affiliated employee, PACC provided N. Kassa a copy of the SPD.  <u>See</u> Complaint ¶ 12, at 3 (setting forth this fact); Amended Answer ¶ 12, at 3 (admitting this fact).

### 2.    <u>R. Kassa's Death.</u>

On September 4, 2008, Richard Kassa, "who was 77 years old, tripped and fell while at his home."  Facsimile Transmission from ABQ Health Partners to CIGNA, re: Patient Record for Richard Kassa (dated October 28, 2008), filed March 14, 2011 (Doc. 32-18 at 21)("Medical Record").  R. Kassa suffered a comminuted fracture of the right humerus as a result of the fall and was hospitalized.  <u>See</u> Medical Record at 3 ("X-rays revealed a comminuted fracture of the humerus.").  R. Kassa was admitted to the hospital "for pain control as well as close neurovascular[2] monitoring."  Medical Record at 3.  R. Kassa's "[v]ital signs were stable on admission" to the hospital.  Medical Record at 3.  The Medical Record reported that R. Kassa's past medical history included Parkinson's disease, diabetes, hypertension, and high cholesterol.  <u>See</u> Medical Record at 3. R. Kassa's "course [at the hospital] was uncomplicated."  Medical Record at 4.  His pain was controlled and his "neurovascular status remained stable," and on September 5, 2008, he was "deemed stable for discharge to home on the 2nd hospital day."  Medical Record at 4.  Dr. Richard

---

[2] "Neurovascular" means "of, relating to, or involving both nerves and blood vessels." Merriam   Webster,   Definition   of   Neurovascular, http://www.merriam-webster.com/medical/neurovascular?show=0&t=1306942491 (last visited June 1, 2011).

Meredick instructed R. Kassa "to resume his normal medication routine . . . [,] to keep his coaption splint . . . clean, dry and intact at all times," and "to sleep with his head elevated at least 45 degrees." Medical Record at 4.

On September 6, 2008, N. Kassa contacted the police at 3:28 a.m. about having discovered R. Kassa "dead on a chair."  State of New Mexico, Uniform Incident Report at 1 (dated September 6, 2008), filed March 14, 2011 (Doc. 32-18 at 6).  See Complaint ¶ 14 at 3-4 (setting forth this fact); Amended Answer ¶ 14, at 3-4 (admitting this fact).  The paramedics on the scene stated that R. Kassa "appeared to have been dead for several hours."  Uniform Incident Report at 1.  N. Kassa reported that R. Kassa was asleep in his chair when she had gone to bed around 10:30 p.m.  See Uniform Incident Report at 1.

### 3.      The Office of the Medical Investigator's Investigation.

The Office of the Medical Investigator ("OMI") investigated R. Kassa's death and determined that he died of complications from the accident, which aggravated his cardiovascular disease.   On September 6, 2008, Medical Investigator and forensic pathologist Dr. Karen Cline-Parhamovich performed a postmortem examination of R. Kassa.  See Autopsy Report (dated September 6, 2008), filed March 14, 2011 (Doc. 32-17 at 9).  Dr. Cline-Parhamovich opined that R. Kassa had "died of atherosclerotic and hypertensive cardiac disease, which was exacerbated by multiple fractures of the right arm."  Autopsy Report at 5.  The examination found "severe atherosclerotic disease of Mr. Kassa's coronary arteries (narrowing of the vessels that supply blood to the heart.)"  Autopsy Report at 5.  R. Kassa's "heart was enlarged due to systemic and pulmonary hypertension (high blood pressure in the body and lungs)," and his brain had "marked changes from high blood pressure in a region of the brain that would cause movement disorders, stiffness and tremors (which increases the risk of falling)."  Autopsy Report at 5.  R. Kassa also had "evidence

of chronic lung disease in the form of emphysema," and "[h]is kidneys showed evidence of injury

by both high blood pressure and diabetes."  Autopsy Report at 6.  The Autopsy Report states:

> The right humerus was fractured in multiple places with hemorrhage into the soft tissues of the arm and shoulder.  The pain and·severity of the arm fractures caused a significant amount of stress on the decedent's already diseased heart.  Diabetics have decreased sensation due to injury to the nerves from the disease and likely contributed to his fall.
>
> . . . .
>
> The manner of death is accident.

Autopsy Report at 6.

Under the section titled "Cause of Death," R. Kassa's Certificate of Death (dated September

12, 2008), filed March 14, 2011 (Doc. 32-18 at 5), lists "[a]therosclerotic and hypertensive

cardiovascular disease" as the "[e]vents such as diseases, injuries, or complications that directly

caused the death," and lists "[c]omplications of humerus fractures, Parkinson's disease, diabetes"

as "[o]ther significant conditions contributing to death."  Certificate of Death at 1.  The death

certificate listed the manner of death as an "accident."  Certificate of Death at 1.

### 4.   N. Kassa's AD&D Claim.

On September 22, 2008, N. Kassa submitted an AD&D Benefits claim under the Group

Accident Policy.  See Insurance Claim at 1; Complaint ¶ 15 at 4 (setting forth this fact); Amended

Answer ¶ 15, at 4 (admitting this fact).  N. Kassa submitted information with her claim for AD&D

benefits, and CIGNA obtained information relating to N. Kassa's claim as part of its investigation,

including R. Kassa's medical records and Autopsy Report.  See Letter from CIGNA to Lovelace

Urgent Care Clinic (dated October 15, 2008), filed March 14, 2011 (Doc. 32-17 at 7); Letter from

CIGNA to Lovelace Medical Center (dated October 15, 2008), filed March 14, 2011 (Doc. 32-17

at 8); Complaint ¶ 16 at 4 (setting forth this fact); Amended Answer ¶ 16, at 4 (admitting this fact).

-7-

R. Kassa's treating orthopedic surgeon, Richard Merideck, M.D., called CIGNA and stated that he agreed that R. Kassa's "death was caused by the injury, such a bad break of the arm, in five places." Claim Telephone Documentation at 1 (dated October 28, 2008), filed March 14, 2011 (Doc. 32-16, at 20). CIGNA's claims adjuster, Barry Fraser, noted the call and wrote "Deceased due to a fall with acute trauma." Claim Telephone Documentation at 1 (dated October 28, 2008), filed March 14, 2011 (Doc. 32-16, at 20)(emphasis original).

### a.   Dr. Eaton's Opinion.

On November 7, 2008, CIGNA informed Kassa that it was submitting the "medical records received in support of [her] claim to an independent medical records reviewer." Letter from CIGNA to Nikki Kassa (Dated November 7, 2008), filed March 14, 2011 (Doc. 32-16 at 5). CIGNA referred the medical records to MES Solutions, a third party vendor, to obtain an independent review. See Request for Vendor Services (dated November 7, 2008), filed March 14, 2011 (Doc. 32-14, at 2). CIGNA asked the medical reviewer to respond to two questions:

1. Please comment on the degree of atherosclerotic and hypertensive cardiac disease present at autopsy and the extent to which you feel, with a reasonable degree of medical certainty, these conditions resulted in Mr. Kassa's death.

2. Please elaborate on the extent to which, with a reasonable degree of medical certainty, Mr. Kassa's broken arm may have resulted in cardiorespiratory arrest and death?

Request for Vendor Services at 1-2.

MES Solutions assigned the review of the medical records to Dr. Mark H. Eaton, who prepared a report of his findings dated November 19, 2008. See Peer Review Report (dated Nov. 19, 2008), filed March 14, 2011 (Doc. 32-13, at 23). Dr. Eaton is Board Certified in Internal Medicine with a Specialty Certificate in Cardiovascular Disease. See Peer Review Report at 2; Curriculum Vitae Mark H. Eaton, M.D., FACC, filed March 18, 2011 (Doc. 34-1, at 4)("Eaton

-8-

CV"). Dr. Eaton has experience in cardiology, and currently is in private practice with Sacramento Heart & Vascular Medical Associates, a cardiology group in Sacramento, California. See Eaton CV at 1-2. Dr. Eaton spent ninety minutes reviewing the following materials relating to R. Kassa: (i) Autopsy Report Disclosure Authorization; (ii) Notes from Dr. Deutsch Baldwin; (iii) Lovelace Health System Admission Record; (iv) Emergency Nursing Record; (v) Extremity Injury Guidelines; (vi) Emergency Physician Record; (vii) Message from Medicare about Rights; (viii) Urgent Care Record; (ix) Labs, X-ray of Shoulder; (x) Report of Findings; (x) Toxicology Report; (xi) Certificate of Death; (xii) Incident Report -- State of New Mexico; and (xiii) Release of General Health Records. See Peer Review Report at 1; MES Invoice at 1 (dated November 19, 2008)(Doc. 32-13, at 22)(billing ninety minutes for Dr. Eaton's services). Dr. Eaton noted that the autopsy had "demonstrated coronary artery disease with evidence of an 80-90% stenosis in the proximal left anterior descending artery, 80-90% stenosis in the mid-right coronary artery and a 30% stenosis in the left circumflex artery." Peer Review Report at 1. Dr. Eaton stated that R. Kassa had "clinically significant atherosclerotic coronary artery disease as well as hypertensive heart disease." Peer Review Report at 2. Dr. Eaton opined that the findings about R. Kassa's cardiovascular disease "are clinically significant and in my opinion the most likely cause of the claimant's death." Peer Review Report at 2. Dr. Eaton stated that "there were no specific findings to indicate that [the fracture of the right humerus] was directly or indirectly responsible for the claimant's death." Peer Review Report at 2.

### b.     **CIGNA's Denial of N. Kassa's Insurance Claim.**

On November 22, 2008, CIGNA informed N. Kassa that it would deny her Insurance Claim. See Letter From CIGNA to N. Kassa (dated November 22, 2008), filed March 14, 2011 (Doc. 32-13, at 12)("November 22, 2008 Letter"). CIGNA stated that it based its decision on both the Group

Accident Policy's definition of a covered loss and the Sickness Exclusion.  See November 22, 2008

Letter at 1.   CIGNA summarized the evidence in the file, including the opinions of Dr.

Cline-Parhamovich and of Dr. Eaton.  See November 22, 2008 Letter at 2-3.  CIGNA found that:

> This policy . . . is an Accident Policy which pays benefits for losses incurred only from accidental injuries within the specifications outlined above.  Having reviewed the available record, indications are that Richard Kassa died as a result of atherosclerotic and hypertensive cardiovascular disease.
>
> Injury or death resulting from disease or bodily infirmity, such as atherosclerotic heart disease, is not covered by the provisions of Policy OK 815669.  Based on this, we've determined that no Dependent Accidental Death benefits are payable at this time.
>
> Please note that, as we do not discount Dr. Parhamovich's assertion that diabetic neuropathy may have contributed to Mr. Kassa's fall and injury on 9/4/2008, we do not dispute that Mr. Kassa's severe fracture of his right humerus may have affected his overall condition.  We do not, however, find evidence that the injury sustained in this fall, resulted, independently from significant underlying physical conditions, most notably, severe heart disease, in Mr. Kassa's death.

November 22, 2008 Letter at 2-3.

**5.**    **N. Kassa's Appeal of CIGNA's Denial.**

N. Kassa timely appealed CIGNA's adverse claim determination.  See Complaint ¶ 16 at 4

(setting forth this fact); Amended Answer ¶ 16, at 4 (admitting this fact).  On March 19, 2009,

Charles R. Finley, N. Kassa's counsel, submitted medical records in support of her administrative

appeal.  See Letter from Charles R. Finley to CIGNA (dated March 19, 2009), filed March 14, 2011

(Doc. 32-11, at 22).  On April 10, 2009, Mr. Finley sent a letter to CIGNA, see Letter from Charles

R. Finley to CIGNA (dated April 10, 2009), filed March 14, 2011 (Doc. 32-11, at 13), with an

affidavit of Dr. Cline-Parhamovich, see Affidavit of Karen Cline-Parhamovich, DO (executed April

9, 2009), filed March 14, 2011 (Doc. 32-11, at 14).  Dr. Cline-Parhamovich opined that "Mr. Kassa

would not have died on September 6, 2008 had he not suffered comminuted fractures of his right

humerus two days earlier."  Cline-Parhamovich Aff. ¶ 4, at 2.  She stated:

> The accident caused significant and deleterious bodily injuries to Mr. Kassa.
> I base my opinion on the following reasons:
>
> A.  Short post-injury interval.  Mr. Kassa was at his baseline state of health
> at the time of his fall and pursued his normal activities of daily living.  The
> interval between his fall and death was only two days.  During this interval,
> he had increasing difficulty in mobility and complained of right arm pain.
> He never fully recovered.  The short·post-injury survival time, along with
> post-injury declining health status without recovery, makes it highly unlikely
> that his fractured arm was coincidental.
>
> B.  Comorbid conditions.  Older people are more fragile physically and
> medically.  This is likely due, in part, to pre-existing medical conditions,
> which decrease physiologic reserve.  Seemingly minor injuries to a younger
> person can lead to significant morbidity and mortality in an older person.
>
> C.  Cardiovascular system.  Mr. Kassa's heart was enlarged and thickened
> (from hypertension) and he had coronary atherosclerosis (narrowing of the
> main vessels of the heart).  Due to the increased cardiac muscle mass, an
> enlarged heart has a higher oxygen/metabolic demand, while narrowed
> coronary arteries lead to decreased oxygen/metabolic supply.  Mr. Kassa's
> fracture caused bleeding and severe pain, which further increased the oxygen
> demand of his heart.  After two days of this increased metabolic demand Mr.
> Kassa's cardiovascular system decompensated and he died.
>
> D.  A pulmonary embolism (blood clot which travels to the lungs) or a fat
> embolism (marrow from the fracture site which travels to the lungs) are not
> always present in traumatic fractures.  Therefore, the absence of these
> findings does not exclude the possibility that a fracture caused or contributed
> to death.
>
> For these reasons, I feel the fall and resulting injuries on September 4, 2008
> proximately set in motion the events, which resulted in Mr., Kassa's death on
> September 6r 2008.

Cline-Parhamovich Aff. ¶¶ 3-4, at 1-3.

N. Kassa also submitted to CIGNA R. Kassa's records from his primary care physician,

Randal J. Lewis, MD, for the period from March 25, 2005 through June 17, 2008.  See Randal J.

Lewis' Records for Richard Kassa, filed March 14, 2011 (Doc. 32-12, at 5)("Lewis' Records for R.

Kassa"). These records show that R. Kassa's heart was found to be normal on objective examination

and that Dr. Lewis felt R. Kassa's hypertension to be "controlled" with medication. Lewis' Records

for R. Kassa at 6, 10, 13. Dr. Lewis did not refer R. Kassa to see a cardiologist.

On August 26, 2009, CIGNA requested that Dr. Paul D. Seiferth review R. Kassa's records

in connection with the administrative appeal review. See Staffing Documentation Form, filed March

14, 2011 (Doc. 32-10, at 21). Dr. Seiferth, who is board certified in family medicine, is CIGNA's

Head Medical Director, and also has a private occupational medicine consulting practice. See

Resume of Paul D. Seiferth at 1-2, MD, FAAFP, filed March 18, 2011 (Doc. 34-1). Dr. Seiferth has

experience in emergency room and occupational medicine practice. See Resume of Paul D. Seiferth

at 1-2. CIGNA asked Dr. Seiferth to "review records and determine if Mr. Kassa's death was the

result of his multiple comorbities." Staffing Documentation Form at 1. In a single, hand-written

sentence, Dr. Seiferth opined: "Following review of the provided medical it is my opinion that Mr.

Kassa had significant [coronary artery disease] and poorly controlled [diabetes mellitus] and there

is nothing in the available medical to connect the fracture[d] humerus to the death other than

co-incidental not causal." Staffing Documentation Form at 1.

On September 2, 2009, CIGNA notified N. Kassa that it affirmed its decision to deny her

Insurance Claim. See Letter from CIGNA to Charles R. Finley (dated September 2, 2009), filed

March 14, 2011 (Doc. 32-10, at 17)("September 2, 2009 Letter"). CIGNA stated that it had

reviewed all of the materials in the file, including Dr. Cline-Parhamovich's affidavit and the other

materials N. Kassa submitted in support of her appeal. See September 2, 2009 Letter at 2. After

summarizing Dr. Eaton's and Dr. Cline-Parhamovich's opinions, CIGNA stated the grounds for its

appeals determination:

> In order to evaluate the cause of Mr. Kassa's death, considering the additional

information we received on appeal, we had the medical records reviewed by our In House Medical Director.  He stated that following his review of the medical records it was his opinion that Mr. Kassa had significant coronary artery disease and poorly controlled diabetes mellitus.  There was nothing in the available medical records to connect, the fractured humerus to the death of Mr. Kassa other than coinsidence.

This policy, as quoted previously, will not pay benefits for a loss that results from a sickness, disease or bodily infirmity.  Our review has determined that Mr. Kassa died as a result of coronary artery disease and hypertensive heart disease.  Therefore, since Mr. Kassa's death resulted from a sickness, disease or bodily infirmity we have determined that no benefits are payable under the [Group Accident Policy].

Additionally, this policy states that benefits will only be paid for bodily injuries which, directly and from no other cause results in a covered loss. A review of the information contained in the claim file supports the fact that Mr. Kassa's death was not directly and from no other cause a result of a broken arm.  Rather, his death was the result of his multiple medical conditions.  Therefore, since we have determined that Mr. Kassa's death was not directly and from no other cause, the result of a covered loss, we have determined that no benefits are payable under the [Group Accident Policy].

September 2, 2009 Letter at 2.  With the conclusion of the appeal, Kassa exhausted her administrative remedies through CIGNA.  See September 2, 2009 Letter at 2.

## PROCEDURAL BACKGROUND

On September 2, 2010, N. Kassa filed her Complaint for Wrongful Denial of Accidental Death Benefits and Breach of ERISA Rights in the Second Judicial District Court, County of Bernalillo, State of New Mexico.  See Doc. 1-1.  She brought claims for: (i) breach of her ERISA contract rights under the SPD; (ii) breach of ERISA's time deadlines; (iii) breach of her ERISA contract rights under the Group Accident Policy; (iv) and inadequate review of her Insurance Claim. See Complaint Counts I-IV, at 4-14.  N. Kassa seeks judgment that she is entitled to AD&D benefits under the Group Accident Policy, with interest, "all equitable and statutory remedies to which she is entitled, attorney fees as provided for: by ERISA, Plaintiff's cost's, and for such other relief the court deems just and proper."  Complaint at 14.

N. Kassa now moves the Court to overturn CIGNA's denial of her Insurance Claim for AD&D benefits.  She further requests that the Court order the Defendants to pay the AD&D benefits that she contends are due to her, and award her pre-judgment and post-judgment interest, costs, and attorney fees, as well as any other statutory or equitable relief that the Court deems just and proper. N. Kassa asserts that the Defendants: (i) "breached Plaintiff's ERISA contract rights under the Summary Plan Description"; (ii) "breached Plaintiff's ERISA contract rights under the Accidental Death Policy"; and (iii) "breached Plaintiff's ERISA procedural rights when Defendants did not provide Plaintiff with a reasonable opportunity for a full and fair review of her claim and adverse benefit determination."  Motion at 2.  She contends that she will prevail if she establishes any one of these assertions.

The Defendants respond that R. Kassa's pre-existing coronary artery disease -- and not the his accidental arm fractures -- caused his death.  They assert that N. Kassa has failed to satisfy her burden to prove that R. Kassa's death was a covered loss under the Group Accident Policy, and that CIGNA has satisfied its burden to show that the Sickness Exclusion barred N. Kassa's claim.  The Defendants contend that, on these grounds, the Court should enter judgment in favor of CIGNA and PACC, and deny N. Kassa's requested judgment.

At the April 27, 2011 hearing, N. Kassa testified about her reliance on the SPD's description of the Group Accident Policy's coverage.  See Transcript of Hearing at 20:15-28:22 (taken April 27, 2011)("Tr.").[3]  The Defendants asserted that "there is absolutely no inconsistency between the language of the summary plan description and the language of the group policy."  Tr. at 32:15-17 (Englert).

_____

[3] The Court's citations to the transcript are to the Court Reporter's original, unedited version. Any final version may contain slightly different line or page numbers.

**RELEVANT LAW REGARDING ERISA**

Congress enacted ERISA to ensure the proper administration of employee benefit plans, including pension plans, both during the years of an employee's active service and after retirement. See Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan, 433 F.3d 1091, 1095 (9th Cir. 2006). ERISA provides a uniform regulatory regime over employee-benefit plans and includes expansive preemption provisions which are intended to ensure that employee-benefit-plan regulation would be "exclusively a federal concern." Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)). There are several civil enforcement provisions under ERISA. Those provisions can be put into three general categories: (i) those found under section 502, 29 U.S.C. § 1132; (ii) those found under section 409, 29 U.S.C. § 1109; and (iii) miscellaneous provisions found elsewhere in ERISA. See Carroll v. Los Alamos Nat. Sec., LLC, 704 F. Supp. 2d 1200, 1208-09 (D.N.M. 2010)(Browning, J.). This case deals with a claim for a civil penalty under § 501(a)(1)(B)("A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan.").

  1.  **Standard of Review.**

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court of the United States stated that an administrator's decision to deny benefits is reviewed under a de novo standard unless the plan provides the administrator with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115. Accord Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 809 (6th Cir. 2002). "In contrast, where a plan does confer discretion upon the administrator to determine eligibility or interpret the terms of the plan, the determinations of the administrator are reviewed under an abuse of discretion standard."

Kosakow v. New Rochelle Radiology Assocs., Inc., 274 F.3d 706, 738 (2d Cir. 2001).  The parties

in this case agree that de novo review is the appropriate standard.  See Motion at 2 (stating that the

Court's review is de novo); Response at 10 ("The parties agree that the Court will consider this case

under the de novo standard."); Complaint ¶ 45, at 7 ("The review of the claim must be *de novo*."

(emphasis original)); Amended Answer ¶ 45, at 1 ("PACC and LINA admit the allegations of

paragraph 45 of the complaint."); Clerk's Minutes, filed December 8, 2010 (Doc. 19)(noting that

the parties agreed to de novo review at the December 8, 2010 Initial Scheduling Conference).  In

de novo review, an ERISA plan defendant "must show that the claimant's interpretation of the Plan

is unreasonable."  Kosakow v. New Rochelle Radiology Assoc., Inc., 274 F.3d at 738 (citations

omitted).

The Court will give the language of the Group Accident Policy "'its common and ordinary

meaning as a reasonable person in the position of the [plan] participant, not the actual participant,

would have understood the words.'"  Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir.

1996)(quoting Blair v. Metro. Life Ins. Co., 974 F.2d 1219, 1221 (10th Cir. 1992).  The Court will

construe the Plan "without deferring to either party's interpretation."  Firestone Tire & Rubber Co.

v. Bruch, 489 U.S. at 112.

Under the de novo standard of review, "the insured carries the burden of showing a covered

loss has occurred and the insurer must prove facts that bring a loss within an exclusionary clause of

the policy."  McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1205 (10th Cir. 1992)(citing

M.H. Lipiner & Son, Inc. v. Hanover Ins. Co., 869 F.2d 685, 687 (2d Cir. 1989); Tex. E.

Transmission Corp. v. Marine Office-Appleton & Cox Corp., 579 F.2d 561, 564 (10th Cir. 1978)).

See Blair v. Metro. life Ins. Co., 974 F.2d at 1221 ("The insured, Blair, carries the burden of

showing a covered loss, and the insurer, MetLife, must prove facts that bring a loss under the

exclusionary clause of the policy.").   The Court must limit its review to the evidence in the administrative record, unless "circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1202 (10th Cir. 2002)(citations omitted).

### 2.   **Summary Plan Descriptions and Plan Language.**

Pursuant to 29 U.S.C. § 1022(a):

> A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title.   The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.   A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant . . . .

29 U.S.C. § 1022(a).   Under § 1022(b), the summary plan description must contain "the plan's requirements respecting eligibility for participation and benefits . . . [and] circumstances which may result in disqualification, ineligibility, or denial or loss of benefits . . . ."   29 U.S.C. § 1022(b).   If a court reviews plan documents and finds them unambiguous, they may be construed as a matter of law.   See Hickman v. Gem Ins. Co., 299 F.3d 1208, 1212 (10th Cir. 2002).   ERISA plan language is to be given its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean.   See Hickman v. Gem Ins. Co., 299 F.3d at 1212 (quoting Blair v. Metro. Life Ins. Co., 974 F.2d at 1221 (stating that not to give language its ordinary meaning "would thwart the congressional purpose of ERISA's disclosure provisions which are designed to ensure that the individual participant knows exactly where he stands with respect to the plan")(internal quotations omitted).   The presence of ambiguity in a contract term must be determined as a matter of law; an ambiguous contract term is one "reasonably susceptible to more

than one interpretation." <u>Hickman v. Gem Ins. Co.</u>, 299 F.3d at 1212 (quoting <u>Carland v. Metro.</u> <u>Life Ins. Co.</u>, 935 F.2d 1114, 1120 (10th Cir. 1991))(internal quotations omitted). <u>See</u> <u>Masella v.</u> <u>Blue Cross & Blue Shield of Conn., Inc.</u>, 936 F.2d 98, 107 (2d Cir. 1991)(stating that, in an ERISA case, all ambiguities in a plan must be construed against the employer).

## ANALYSIS

The two fundamental issues before the Court are: (i) did CIGNA correctly determine that R. Kassa's death was not a covered loss, because a pre-existing health condition, coronary artery disease -- not the accidental bodily injury, his fractured arm - caused the death; and (ii) did CIGNA correctly determine that the Group Accident Policy's Sickness Exclusion also barred Kassa's AD&D benefits claim.  The Defendants contend that CIGNA correctly denied N. Kassa's claim, because R. Kassa's pre-existing medical condition caused or contributed to his death.  They assert that courts have upheld denials of benefits under policy terms materially identical to the Group Accident Policy's terms.  They argue that, based on the medical evidence, the terms of the Group Accident Policy, and the relevant case law, CIGNA correctly denied N. Kassa's claim, and that the Court should therefore enter judgment in favor of CIGNA and PACC, upholding CIGNA's claim determination.

N. Kassa bears the burden of proof for showing that CIGNA did not correctly determine N. Kassa's death was not a covered loss.  CIGNA bears the burden of proof for showing that it correctly determined that the Group Accident Policy's Sickness Exclusion barred N. Kassa's AD&D benefits claim.  The evaluation of both issues turns on whether the proximate cause of R. Kassa's death was his accidental injury or his pre-accident disease.

The Court finds that R. Kassa's fracture, which aggravated his coronary artery disease, caused his death.  Dr. Cline-Parhamovich, the Medical Investigator and forensic pathologist, whose

-18-

opinion the Court credits, opined that he would not have died but for the fracture, and noted that R. Kassa was at his baseline level of health before the accident, suggesting that his fall and fracture were necessary and sufficient to cause his death.  The fracture aggravated his coronary artery disease, leading to a decline in his health that eventually resulted in his death.  The Court therefore concludes that CIGNA incorrectly determined that the fracture did not cause R. Kassa's death and improperly denied N. Kassa's Insurance Claim.

The Court further concludes that, because an accidental physical injury caused R. Kassa's death, his death is covered under the Group Accident Policy and is not excepted under the Sickness Exclusion, and N. Kassa is entitled to judgment in her favor.  CIGNA therefore breached N. Kassa's ERISA contract rights under the Group Accident Policy and the SPD.  The Court will therefore order the Defendants to pay N. Kassa $30,000.00 under the terms of the policy, pre- and post-judgment interest, Attorneys fees, and costs.

## I.   R. KASSA'S DEATH IS COVERED UNDER THE GROUP ACCIDENT POLICY.

The Court concludes that R. Kassa's death is covered under the Group Accident Policy.  The record demonstrates that R. Kassa's death was an accident, because he died as a result of falling and fracturing his arm.  "Mr. Kassa would not have died on September 6, 2008 had he not suffered comminuted fractures of his right humerus two days earlier."  Cline-Parhamovich Aff. ¶ 4, at 2. "[T]he fall and resulting injuries on September 4, 2008 proximately set in motion the events, which resulted in Mr. Kassa's death on September 6, 2008."  Cline-Parhamovich Aff. ¶ 4, at 3.  Under Tenth Circuit case law, because the accident, and not illness, caused R. Kassa's hospitalization and death, his death is covered under the Group Accident Policy's coverage of deaths resulting from "bodily injuries . . . caused by an accident . . . which, directly and from no other causes, result in a covered loss."  Group Accident Policy at 1.  Moreover, because the Sickness Exclusion mirrors the

coverage terms, providing that "[n]o benefits will be paid for loss resulting from . . . [s]ickness, disease, or bodily infirmity," Group Accident Policy at 3, the Sickness Exclusion does not exclude his death from the Group Accident Policy's coverage.

### A.   R. KASSA DIED DIRECTLY OF THE INJURIES HE SUSTAINED FROM HIS FALL.

After carefully reviewing the evidence in the record, the Court concludes that the accidental injuries R. Kassa sustained in the fall on September 4, 2008 proximately caused his death.  On September 6, 2008, Dr. Cline-Parhamovich, the Medical Investigator, investigated R. Kassa's death and determined that he died of complications from the accident, which aggravated R. Kassa's cardiovascular disease.  In her autopsy report, Dr. Cline-Parhamovich opined that R. Kassa had "died of atherosclerotic and hypertensive cardiac disease, which was exacerbated by multiple fractures of the right arm."  Autopsy Report at 5.  The examination found "severe atherosclerotic disease of Mr. Kassa's coronary arteries (narrowing of the vessels that supply blood to the heart.)" Autopsy Report at 5.  6.  The Autopsy Report states:

> The right humerus was fractured in multiple places with hemorrhage into the soft tissues of the arm and shoulder.  The pain and·severity of the arm fractures caused a significant amount of stress on the decedent's already diseased heart. Diabetics have decreased sensation due to injury to the nerves from the disease and likely contributed to his fall.
>
> . . . .
>
> The manner of death is accident.

Autopsy Report at 6.  The death certificate listed the manner of death as an "accident." Certificate of Death at 1.  The Death Certificate lists "[a]therosclerotic and hypertensive cardiovascular disease" as the "[e]vents such as diseases, injuries, or complications that directly caused the death," and lists "[c]omplications of humerus fractures, Parkinson's disease, diabetes" as "[o]ther significant

-20-

conditions contributing to death." Certificate of Death at 1. Dr. Cline-Parhamovich's affidavit

clarifies the interworkings of R. Kassa's causes of death. She stated:

> Mr. Kassa would not have died on September 6, 2008 had he not suffered comminuted fractures of his right humerus two days earlier. The accident caused significant and deleterious bodily injuries to Mr. Kassa. I base my opinion on the following reasons:

> A. Short post-injury interval. Mr. Kassa was at his baseline state of health at the time of his fall and pursued his normal activities of daily living. The interval between his fall and death was only two days. During this interval, he had increasing difficulty in mobility and complained of right arm pain. He never fully recovered. The short post-injury survival time, along with post-injury declining health status without recovery, makes it highly unlikely that his fractured arm was coincidental.

> B. Comorbid conditions. Older people are more fragile physically and medically. This is likely due, in part, to pre-existing medical conditions, which decrease physiologic reserve. Seemingly minor injuries to a younger person can lead to significant morbidity and mortality in an older person.

> C. Cardiovascular system. Mr. Kassa's heart was enlarged and thickened (from hypertension) and he had coronary atherosclerosis (narrowing of the main vessels of the heart). Due to the increased cardiac muscle mass, an enlarged heart has a higher oxygen/metabolic demand, while narrowed coronary arteries lead to decreased oxygen/metabolic supply. Mr. Kassa's fracture caused bleeding and severe pain, which further increased the oxygen demand of his heart. After two days of this increased metabolic demand Mr. Kassa's cardiovascular system decompensated and he died.

> D. A pulmonary embolism (blood clot which travels to the lungs) or a fat embolism (marrow from the fracture site which travels to the lungs) are not always present in traumatic fractures. Therefore, the absence of these findings does not exclude the possibility that a fracture caused or contributed to death.

> For these reasons, I feel the fall and resulting injuries on September 4, 2008 proximately set in motion the events, which resulted in Mr., Kassa's death on September 6r 2008.

Cline-Parhamovich Aff. ¶¶ 3-4, at 1-3. R. Kassa's treating orthopedic surgeon, Dr. Merideck, called

CIGNA and stated that he agreed that R. Kassa's "death was caused by the injury, such a bad break

of the arm, in five places." Claim Telephone Documentation at 1.  CIGNA's claims adjuster, Fraser,

noted the call and wrote "Deceased due to a fall with <u>acute trauma</u>."  Claim Telephone

Documentation at 1 (emphasis original).  R. Kassa's primary care physician, Dr. Lewis, found R.

Kassa's hypertension to be "controlled" with medication before the accident, and did not refer R.

Kassa to see a cardiologist.  Lewis' Records for R. Kassa at 6, 10, 13.

The Defendants assert that Dr. Eaton and Dr. Seiferth disagree with Dr. Cline-Parhamovich's

opinion.  Neither Dr. Eaton nor Dr. Seiferth, however, address Dr. Cline-Parhamovich's reasoning

for attributing R. Kassa's death to his accidental injury.[4]  The entirety of Dr. Seiferth's opinion

_____

[4] N. Kassa argues in part that CIGNA failed to adequately review the documentation that she
submitted in support of her claim and appeal.  In particular, she asserts that CIGNA, Dr. Eaton, and
Dr. Seiferth do not address Dr. Cline-Parhamovich's explanation for attributing R. Kassa's death
to his accidental physical injuries from the fall.  The Defendants acknowledge that Dr. Eaton's
report does not account for Dr. Cline-Parhamovich's statements in her affidavit, noting that Dr.
Eaton's report predated Dr. Cline-Parhamovich's affidavit, and asserting that Dr. Eaton nonetheless
disagreed with Dr. Cline-Parhamovich's opinion.  In response to N. Kassa's contention that Dr.
Seiferth did not review or respond to Dr. Cline-Parhamovich's affidavit, the Defendants assert:

> Although Dr. Seiferth did not list the documents that he reviewed in the summary of
> his opinion, the administrative record shows that Dr. Seiferth reviewed the entire file.
> The referral to Dr. Seiferth asked him to "review records" without any limitation
> Rec. 141.  Moreover, in the appeal determination letter, LINA stated that "[i]n order
> to evaluate the cause of Mr. Kassa's death considering the additional information we
> received on appeal, we had the medical records reviewed by our In House Medical
> Director."  Rec. 139 (emphasis added); <u>see</u> <u>also</u> Rec. 138 (listing Dr.
> Cline-Parhamovich's affidavit and Dr. Lewis' notes as among the materials reviewed
> during the appeal).  Dr. Seiferth's review encompassed the appeal submissions.

Response at 22-23.  Because the Court concludes that the Defendants breached the terms of the
Group Accident Policy and the SPD, it need not determine whether the Defendants also violated her
ERISA procedural rights, which N. Kassa advanced as an alternative basis for establishing that she
is entitled to AD&D benefits under the policy.  Nonetheless, the Court is unconvinced that the cited
materials in the record demonstrate that Dr. Seiferth reviewed any particular materials.  Unlike Dr.
Eaton, who stated in his two-paged, single-spaced typed report that he reviewed the following
materials relating to R. Kassa: (i) Autopsy Report Disclosure Authorization; (ii) Notes from Dr.
Deutsch Baldwin; (iii) Lovelace health System Admission Record; (iv) Emergency Nursing Record;
(v) Extremity Injury Guidelines; (vi) Emergency Physician Record; (vii) Message from Medicare

states: "Following review of the provided medical it is my opinion that Mr. Kassa had significant [coronary artery disease] and poorly controlled [diabetes mellitus] and there is nothing in the available medical to connect the fracture[d] humerus to the death other than co-incidental not causal." Staffing Documentation Form at 1.  Dr. Seiferth does not elaborate on what the "provided medical" included, or whether it included Dr. Cline-Parhamovich's affidavit.  Regardless, Dr. Seiferth does not address Dr. Cline-Parhamovich's account in the autopsy report and in her affidavit why she concluded, based on the temporal proximity of the fracture and R. Kassa's death, R. Kassa's age, and R. Kassa's steadily declining health after the fracture, that R. Kassa proximately died as a result of his accidental injury.  He only states that "nothing in the available medical" would lead to this conclusion.  Because Dr. Cline-Parhamovich forcefully argues in support of her conclusion, because hers is the only independent medical opinion before the court -- CIGNA hired Dr. Eaton and Dr. Seiferth is CIGNA's "in house doctor," and because of the three doctors, Dr. Cline-Parhamovich alone is a forensic pathologist, meaning she is trained to determine the cause of death, the Court credits Dr. Cline-Parhamovich's opinion, and concludes that R. Kassa died as a result of the injuries he sustained in his fall.  Those injuries aggravated his cardiovascular disease, causing his death, and he "would not have died on September 6, 2008 had he not suffered comminuted fractures of his right humerus two days earlier."  Cline-Parhamovich Aff. ¶ 4, at 2.

**B.      R. KASSA'S DEATH IS COVERED UNDER THE GROUP ACCIDENT POLICY.**

The Court concludes that R. Kassa's death falls under the Group Accident Policy's coverage.

---

about Rights; (viii) Urgent Care Record; (ix) Labs, X-ray of Shoulder; (x) Report of Findings; (x) Toxicology Report; (xi) Certificate of Death; (xii) Incident Report - State of New Mexico; and (xiii) Release of General Health Records, see Peer Review Report at 1, Dr. Seiferth's single hand-written sentence on the Staffing Documentation From does not indicate what materials he reviewed.

The Group Accident Policy provides:

> **THIS IS AN ACCIDENT POLICY WHICH DOES NOT PAY BENEFITS FOR LOSS FROM SICKNESS.**
>
> . . . .
>
> [CIGNA] agree[s] to pay benefits for loss from bodily injuries:
>
>> a) caused by an accident which happens while an insured is covered by this policy; and
>>
>> b) which, directly and from no other causes, result in a covered loss. (See the Description of Coverage).
>
> [CIGNA] will not pay benefits if the loss was caused by:
>
>> a) sickness, disease, or bodily infirmity; or
>>
>> b) any of the Exclusions listed in the Policy.

Group Accident Policy at 1. The Group Accident Policy's Sickness Exclusion provides: "No benefits will be paid for loss resulting from . . . [s]ickness, disease, or bodily infirmity. (Bacterial infection resulting from an accidental cut or wound or accidental ingestion of a poisonous food substance are not excluded.)" Group Accident Policy at 3.

The Defendants contend that, "[e]ven if Dr. Cline-Parhamovich's opinion is accepted, the fractured arm did not 'directly and from no other causes, result' in Mr. Kassa's death." They assert that, "[a]lthough Dr. Cline-Parhamovich listed the humerus fractures as a contributing factor, she has never suggested that the fractured arm alone caused Mr. Kassa's death. Therefore, the first element of a covered loss is not present." Response at 12. Dr. Cline-Parhamovich has stated, however, that "Mr. Kassa would not have died on September 6, 2008 had he not suffered comminuted fractures of his right humerus two days earlier." Cline-Parhamovich Aff. ¶ 4, at 2. She further stated that "the fall and resulting injuries on September 4, 2008 proximately set in motion the events, which

resulted in Mr. Kassa's death on September 6, 2008." Cline-Parhamovich Aff. ¶ 4, at 3. Under Tenth Circuit caselaw, Dr. Cline-Parhamovich's opinion, which the Court credits, establishes that R. Kassa's death is covered under the language of the Group Accident Policy.

###        1.        The Group Accident Policy Language Is Not Ambiguous.

The Court finds that the language of the Group Accident Policy is unambiguous. "Questions involving the scope of benefits provided by a plan to its participants must be answered initially by the plan documents, applying the principles of contract interpretation." Chiles v. Ceridian Corp., 95 F.3d at 1515. See Pirkheim v. First UNUM Life Ins. Co., 229 F.3d at 1010 n.2. In other words, "[i]n interpreting the terms of an ERISA plan we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law." Chiles v. Ceridian Corp., 95 F.3d at 1511. The Court will give the language of the Group Accident Policy "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words." Chiles v. Ceridian Corp., 95 F.3d at 1511 (quoting Blair v. Metro. Life Ins. Co., 974 F.2d at 1221 (internal quotation marks omitted)); Pirkheim v. First UNUM Life Ins. Co., 229 F.3d at 1010 n.2; McGee v. Equicor-Equitable HCA Corp., 953 F.2d at 1202. Ambiguity exists when a contract provision is "reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of a term." Stewart v. Adolph Coors Co., 217 F.3d 1285, 1290 (10th Cir. 2000)(quotation marks and citations omitted). If the terms are unambiguous, the court does not apply the reasonable expectations doctrine, "whereby courts will interpret policy language liberally to protect the reasonable expectations of insureds and intended beneficiaries, 'even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.'" Pirkheim v. First UNUM Life Ins. Co., 229 F.3d at 1011 (quoting Saltarelli v. Bob Baker Group Med. Trust, 35 F.3d 382, 386 (9th Cir. 1994)(quoting Robert E.

Keeton & Alan I. Widiss, Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices § 6.3 (West 1988))).

      In Pirkheim v. First UNUM Life Insurance Co., the Tenth Circuit held that language similar to the terms of the Group Accident Policy was unambiguous as a matter of law.  The policy before the Tenth Circuit stated: "The loss must result directly and independently of all other causes from accidental bodily injury which occurs while this policy is in force as to the Insured, herein called 'injury.'"  229 F.3d at 1009.  Like the Group Accident Policy's coverage terms and Sickness Exclusion, the insurance policy stated: "We will not pay if the loss is caused by . . . illness, disease, bodily infirmity, or any bacterial infection . . . ."  Pirkheim v. First UNUM Life Insurance Co., 50 F. Supp. 2d 1018, 1021 (D. Colo. 1999)(citations omitted).  The district court relied on Black's Law Dictionary to interpret "accidental bodily injury," and the Tenth Circuit "wholeheartedly agree[d] with the district court's interpretation of 'accidental bodily injury.'"  229 F.3d at 1010.  The district court "adopt[ed] the following definition of 'accident' as found within Black's Law Dictionary":

> An accident within accident insurance policies is an event happening without any human agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens. A more comprehensive term than "negligence," and in its common signification the word means an unexpected happening without intention or design.

Pirkheim v. First UNUM Life Insurance Co., 50 F. Supp. 2d at 1024 (quoting Black's Law Dictionary 15 (6th ed.1990)).  The district court interpreted "'bodily injury' to mean 'injury to any part of the body, regardless whether that injury is internal or external.'"  50 F. Supp. 2d at 1024.  After concurring with the district court's definitions, the Tenth Circuit interpreted the terms "directly and independently of all other causes," stating:

> We hold the words "directly and independently of all other causes," given their plain and ordinary meaning in context of this particular insuring clause, are not ambiguous.  In stating the "loss must result directly and independently of all other

causes from accidental bodily injury," the policy imposes two obvious conditions. First, the loss must result directly from accidental bodily injury. Second, the loss must result independently of all other causes. In short, we agree with the district court the word "directly" modifies the phrase "from accidental bodily injury." Any other interpretation in this context is contrived.

229 F.3d at 1009.

Because the language in the Group Accident Policy is substantially identical to the language that the Tenth Circuit found unambiguous in <u>Pirkheim v. First UNUM Life Insurance Co.</u>, the Court concludes that the language in the Group Accident Policy is not ambiguous. Like the language at issue in that case, "[t]he loss must result directly and independently of all other causes from accidental bodily injury which occurs while this policy is in force as to the Insured, herein called 'injury.'" 229 F.3d at 1009, the Group Accident Policy covers deaths resulting from "bodily injuries . . . caused by an accident . . . which, directly and from no other causes, result in a covered loss," Group Accident Policy at 1. The language of both policies requires the insured's death result "directly" from bodily injuries, and the death must "not requir[e] or relying on something else," Merriam Webster, Definition of Independent, http://www.merriam-webster.com/ dictionary/independent (last visited June 23, 2011), <u>i.e.</u>, must be "independent," <u>Pirkheim v. First UNUM Life Ins. Co.</u>, 229 F.3d at 1009, and result "from no other causes." Group Accident Policy at 1. At the hearing, the parties agree that there is no "real distinction" between the language in this case and the language in <u>Pirkheim v. First UNUM Life Insurance Co.</u>, specifically terms "independent" and "from no other causes." Tr. at 13:5-13 (Court, Finley). <u>See</u> Tr. at 41:8-11 ("[Englert:] We don't have the word 'independently' here, but the language 'directly and from no other cause' has the same substantive meaning . . . ."). Because there is no material difference between the language that the Tenth Circuit found unambiguous in <u>Pirkheim v. First UNUM Life Insurance Co.</u> and the language in the Group Accident Policy, the Court concludes that the language

of the Group Accident Policy is unambiguous.

### 2.    The Group Accident Policy Covers R. Kassa's Death.

In CIGNA's initial denial of N. Kassa's Insurance Claim, it suggested that it denied that claim in part because it found that R. Kassa's heart disease contributed to his injury, stating: "We do not, however, find evidence that <u>the injury sustained in this fall, resulted, independently from significant underlying physical conditions</u>, most notably, severe heart disease, in Mr. Kassa's death." November 22, 2008 Letter at 2-3 (emphasis added).  The Tenth Circuit has previously rejected insurance companies' denials of AD&D benefits where sickness or disease caused an accident that resulted in a loss.  In <u>Kellogg v. Metropolitan Life Insurance Co.</u>, 549 F.3d 818 (10th Cir. 2008), the plaintiff brought an action against the defendants alleged that she was wrongly denied AD&D benefits under an ERISA regulated plan.  The Tenth Circuit reversed the district court's grant of summary judgment for the defendants on the basis that the death, which resulted from complications of a skull fracture the decedent obtained in single-car automobile accident, was not excluded under a physical illness exception.  The insured died after being involved in a single-car automobile accident:

> He purportedly stopped at a stop sign at the intersection of East Alexander Avenue and Parsons Avenue, and then continued eastbound on East Alexander Avenue. As he proceeded eastbound, his minivan veered into the westbound lane, and then into a tree on the north side of East Alexander Avenue.  A female resident who observed the crash called 911.  Law enforcement and fire officials responded to the scene and found Brad Kellogg "hunched over in the driver's seat" of the minivan, "incoherent and bleeding from his face."  After being extracted from his vehicle, Brad Kellogg was transported to a local hospital, where he died.
>
> The woman who observed the crash and called 911 was questioned by a law enforcement officer and stated
>
>> that she had seen the vehicle with the subject in it make the stop eastbound on E. Alexander at Parsons. [She] said that once the vehicle had taken off from the stop sign at Parsons, that she noticed

-28-

> that the driver appeared to be having a seizure. [She] said that the
> vehicle then veered into the tree on the northside of E. Alexander.
> [She] said that she noticed the subject did not even step on his brakes,
> as she did not see the brake lights, nor did she hear a skid.

549 F.3d at 819-20.  An autopsy determined "[t]he cause of death in th[at] case [wa]s considered

to be extensive subarachnoid hemorrhage of the brain secondary to traumatic transverse basilar skull

fracture" and revealed that the insured had "[l]evels of Bupropion [that] far exceed therapeutic levels

in this patient.  Idiosyncratic reactions of this drug include: numerous neuropsychiatric phenomenon

including psychoses, confusion, delusion, hallucinations, psychotic episodes, and paranoia.  Whether

excessive levels of this drug contributed to this subject's accidental and [sic] death is unknown."

549 F.3d at 820.  Bupropion also "has a reported risk factor of seizures."  549 F.3d at 821.  Similar

to the Group Accident Policy's terms, the insured's AD&D policy covered deaths that resulted from

"accidental injury that is the Direct and Sole Cause of a Covered Loss," and the insurance policy

stated "Direct and Sole Cause means that the Covered Loss occurs within 12 months of the date of

the accidental injury and was a direct result of the accidental injury, independent of other causes."

549 F.3d at 821.   The insurance policy also excluded "any loss caused or contributed to

by . . . physical or mental illness or infirmity, or the diagnosis or treatment of such illness or

infirmity."  549 F.3d at 821.

The plaintiff submitted an AD&D claim, which the defendants denied, stating:

> The police report submitted to us states that, according to a witness to the
> crash, after taking off from a stop sign, the decedent's vehicle veered into a tree.  The
> witness stated that it appeared the decedent was having a seizure.  She saw no attempt
> by the decedent to brake or avoid the tree.  The police could find no other cause for
> the crash.
>
> Under the terms of the plan, AD & D benefits are not payable if a loss is due
> to physical illness.  The decedent's physical illness, the seizure, was the cause of the
> crash.  Accordingly, we must deny your claim.

549 F.3d at 823

Reviewing the defendants' denial de novo, the Tenth Circuit "conclude[d] that the car crash -- not the seizure -- caused the loss at issue, i.e., Brad Kellogg's death, and therefore the exclusionary clause of the policy does not apply":

> The First Circuit dealt with facts very similar to the instant case in <u>Vickers v. Boston Mutual Life Insurance Co.</u>, 135 F.3d 179 (1998) (applying ERISA). The insured suffered a heart attack while driving and died after crashing into a tree. <u>See id.</u> at 180. The accidental death policy excluded "loss resulting from . . . sickness, disease or bodily infirmity." <u>Id.</u> The death certificate listed the cause of death as "[m]ultiple blunt force traumatic injuries secondary to motor vehicle accident precipitated by acute coronary insufficiency." <u>Id.</u>
>
> The insurance company argued that "[t]he nexus between the heart attack and the bodily injuries suffered from the crash was immediate and should be viewed as one entire event even though the heart attack was not the physiological cause of the decedent's death[,]" <u>id.</u> at 181-82, to which the court responded, "[t]his is no answer when we are interpreting the word 'cause' in a layman's insurance policy[,]" <u>id.</u> at 182. The court explained that while the heart attack caused the crash, the crash was the sole cause of the death. <u>Id.</u> The court acknowledged that there would have been no crash (and therefore no loss) but for the insured's heart attack, but rejected the insurer's attempts to justify the exclusion through a complicated analysis of proximate cause. <u>Id.</u> at 181. The court instead emphasized the importance of viewing the policy as an ordinary policyholder would. <u>Id.</u> at 181-82.
>
> We followed this approach in <u>Johnson v. Life Investors' Insurance Co.</u>, 98 Fed. Appx. 814 (10th Cir. 2004) (unpublished opinion) (applying Utah law). While <u>Johnson</u> is not binding precedent, we find it persuasive and adopt its reasoning here. In that case, the insured (who suffered from muscular dystrophy and had a history of falls) fell down his basement stairs and broke his neck. <u>Id.</u> at 815. <u>After being admitted to the hospital, he developed pneumonia and died.</u> <u>Id.</u> <u>According to his physician, the immediate cause of death was "pneumonia due to, or as a consequence of, a cervical spine fracture, and the underlying cause of death [w]as myotonic dystrophy.</u>" <u>Id.</u> The policy at issue excluded coverage "for any loss resulting from any injury caused or contributed to by, or as a consequence of . . . any sickness or infirmity." <u>Id.</u> at 818 (internal quotation marks omitted) (emphasis in original). Strictly construing the language against the insurer, we determined that "coverage is denied under this policy only where the illness causes the hospitalization and death . . . and not where the illness causes an accident that causes the death . . . ." <u>Id.</u> We noted that the insurer could have written the policy in such a way as to exclude accidents caused by illness (rather than only losses caused by illness). <u>Id.</u> We concluded, "[s]ince it is undisputed that the immediate cause of [the insured]'s loss

-30-

was a fall, it is irrelevant under the terms of this policy whether the fall was caused by his myopic dystrophy." Id.

The Minnesota Supreme Court employed similar reasoning in Orman v. Prudential Insurance Co., 296 N.W.2d 380 (1980).  In that case, the insured lost consciousness due to the bursting of a cerebral aneurysm and fell into the bathtub and drowned.  Id. at 381.  The policy excluded losses "caused or contributed to by bodily infirmity or disease."  Id. (internal ellipsis omitted).  The court held for the insured.  See id. at 383.  Although the aneurysm was a disease under the policy, it did not cause the death and therefore was not excluded:

> It was a mere fortuity that the decedent stood over a bathtub full of water at the time the aneurysm burst and rendered her unconscious. In other words, the aneurysm may have contributed to the accident, but it did not contribute to the death.  In such circumstances, the aneurysm is simply too remote to be deemed a direct or contributing cause of death.

Id. at 382.

Similarly, in National Life & Accident Insurance Co. v. Franklin, 506 S.W.2d 765, 766 (Tex. App.1974), the insured, who had a history of epileptic seizures, was found dead in the bathtub; the cause of death was accidental death by drowning.  The insurance policy covered losses resulting "directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means," and contained an exclusionary clause prohibiting payment for losses that "result[ ] from or [are] contributed to by any disease or mental infirmity."  Id.  The court assumed that even if the insured's epilepsy caused him to lose consciousness and fall into the bathtub, it did not cause death by drowning.  Id. at 767.  The court explained, "[t]he epilepsy was merely a cause of a cause and was therefore too remote to bar recovery."  Id.

As these cases make clear, courts have long rejected attempts to preclude recovery on the basis that the accident would not have happened but for the insured's illness.  As then-Judge Taft wrote in Manufacturers' Accident Indemnity Co. v. Dorgan, 58 F. 945, 954 (6th Cir. 1893),

> [I]f the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into. The disease would be but the condition; the drowning would be the moving, sole, and proximate cause.

See also Browning v. Equitable Life Assur. Soc., 94 Utah 532, 72 P.2d 1060, 1076 (Utah 1937) ("A sick man may be the subject of an accident which would not have befallen him but for his sickness.  One may meet his death by falling into a place of danger in a faint or in a fit of epilepsy. But an event has usually been held to be the result of an accident, not of disease.").

In its explanation of the insurance plan to its employees, Pfizer's SPD stated, "If you die as a result of, and within 12 months after, an accident, your beneficiary will receive 100 percent of your AD & D coverage."  The SPD advised that the Plan "does not cover losses due to: . . . physical or mental illness, or diagnosis or treatment for the illness."  Id. at 69.  MetLife's Certificate of Insurance worded the exclusion slightly differently: "We will not pay benefits under this section for any loss caused or contributed to by: [ ] physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity . . . ."  Id. at 293.

Here, the loss (Brad Kellogg's death) was caused by a skull fracture resulting from the car accident, not by physical or mental illness.  While the seizure may have been the cause of the crash, it was not the cause of Brad Kellogg's death.  The Plan does not contain an exclusion for losses due to accidents that were caused by physical illness, but rather excludes only losses caused by physical illness.  Because there is no evidence that the seizure caused Brad Kellogg's death, MetLife's argument fails.

The fact that the policy at issue here excludes losses that were caused or contributed to by physical illness does not change this analysis.  A reasonable policyholder would understand this language to refer to causes contributing to the death, not to the accident.  See Orman, 296 N.W.2d at 382 (rejecting insurer's argument that "caused or contributed to" language excludes illnesses contributing to  the accident but not the death); Franklin, 506 S.W.2d at 768 ("The words 'contributed to' do not serve to allow us to look back along the chain of causation to a remote cause or a cause of a cause.").  Notably, this understanding of the policy's plain meaning is supported by Pfizer's own interpretation of MetLife's coverage: the SPD describes the plan as excluding only losses "due to" physical illness.

549 F3d. at 830-33 (footnotes and citations of the record omitted).  The Tenth Circuit pointed to language discussed in Sekel v. Aetna Life Ins. Co., 704 F.2d 1335, 1336-37 (5th Cir. 1983), for an example of the type of language which would have made for a valid exclusion from coverage: "[N]o payment shall be made for . . . any loss resulting from any injury caused or contributed to, or as a consequence of, any of the following excluded risks, even though the proximate or precipitating cause of loss is accidental bodily injury: (a) bodily or mental infirmity; or (b) disease . . . ."  549

-32-

F3d. at 832 n.5. No such language is in the Kassa policy. To the extent that CIGNA denied N. Kassa's Insurance Claim because R. Kassa's illness contributed to his fall, that argument cannot withstand the Tenth Circuit's opinion in <u>Kellogg v. Metropolitan Life Insurance Co.</u>

The heart of the Defendants' argument is that R. Kassa's cardiovascular disease, and not his injuries from his fall, caused his death. While the Court has rejected the Defendants' broader argument that the injuries played no role, the Defendants further contend that, even if the Court credits Dr. Cline-Parhamovich's opinion, R. Kassa's death is still not covered under the Group Accident Policy, because his fractures did not independently cause his death. The import of the Tenth Circuit's decision is in <u>Kellogg v. Metropolitan Life Insurance Co.</u>, however, is that sickness limitations and sickness exclusions with language substantively identical to the language in the Group Accident Policy do not remove losses from coverage when accidental injuries play a role in the insured's death. Rather, the Court must decide whether the illness or the accident caused the death. Thus, under the terms of the Group Accident Policy, whose terms are substantively identical to the terms at issue in <u>Kellogg v. Metropolitan Life Insurance Co.</u>, "coverage is denied under this policy only where the illness causes the hospitalization and death." 549 F.3d at 831. Because the Court has concluded that R. Kassa's fractures caused his hospitalization and aggravated his heart condition, causing his death, the Court therefore further concludes that his death is covered under the Group Accident Policy. The Tenth Circuit's decision in <u>Johnson v. Life Investors' Insurance Co.</u>, on which Tenth Circuit relied in <u>Kellogg v. Metropolitan Life Insurance Co.</u>, bolsters the Court's conclusion. In <u>Johnson v. Life Investors' Insurance Co.</u>, the Tenth Circuit considered whether an insured's death was covered under an AD&D insurance policy. Johnson had muscular dystrophy and a history of falls. Johnson fell down his basement stairs and broke his neck. In the hospital, Johnson developed pneumonia and died:

> On July 29, 1995, Mr. Johnson stumbled and fell backward down the stairs to his basement.  On July 30, 1995, Johnson was admitted to a hospital for a cervical spine fracture in his neck.  On August 1, 1995, Johnson developed pneumonia and the doctors had difficulty intubating him because of his neck fracture.  On August 2, 1995, when it became apparent that Mr. Johnson could no longer breathe on his own, his family decided to withdraw artificial life support measures.  Johnson died that day and his physician, Dr. Edward Campbell, listed the immediate cause of death on the death certificate as pneumonia due to, or as a consequence of, a cervical spine fracture, and the underlying cause of death as myotonic dystrophy.  The doctor identified the manner of death as an "accident."

98 F. App'x at 815 (citations omitted).  The defendants, relying "on the language in the policy excluding death caused by sickness and defining injury as that caused by an accident 'independent of all other causes,'" denied the plaintiffs' AD&D claim, asserting that the insured's "hospitalization and death were not covered as a result of his preexisting illness."  98 F. App'x at 815.

Notwithstanding the death certificate listing the cause of death as pneumonia, and notwithstanding the role Johnson's disease may have played in his fall, the Tenth Circuit held:

> [A] strict construction of this policy leads to the conclusion that the policy excludes coverage only where the sickness or infirmity directly causes the loss.  Since it is undisputed that the immediate cause of Johnson's loss was a fall, it is irrelevant under the terms of this policy whether the fall was caused by his myopic dystrophy.  Accordingly, summary judgment for Johnson was appropriate.

98 F. App'x at 815.  Thus, although sickness or disease both preceded and follower Johnson's accidental injury, the Tenth Circuit held that his claim was not barred under the requirement that the accident be "independent of all other causes"; instead, the Tenth Circuit construed that language to "exclude[ ] coverage only where the sickness or infirmity directly causes the loss."  98 F. App'x at 815.

Applying the holdings, which were based on substantively identical coverage provisions, from Kellogg v. Metropolitan Life Insurance Co., that "coverage is denied under this policy only where the illness causes the hospitalization and death."  549 F.3d at 831, and from Johnson v. Life

Investors' Insurance Co., that "excludes coverage only where the sickness or infirmity directly

causes the loss," 98 F. App'x at 815, the Court concludes that, although R. Kassa's cardiovacular

disease played a role in his death, because his illness did not cause his hospitalization or directly

cause his death, his death is covered under the Group Accident Policy.[5] Like Johnson's death, which

resulted from "pneumonia due to, or as a consequence of, a cervical spine fracture," 98 F. App'x at

815, R. Kassa's death resulted from atherosclerotic and hypertensive cardiovascular disease

resulting from, or as a consequence of, humerus fractures, see Certificate of Death at 1.  The

Defendants argue that R. Kassa's death is not covered under the Group Accident Policy, because

---

[5] In contrast, the Tenth Circuit stated in a footnote in Kellogg v. Metropolitan Life Insurance
Co.:

> Many cases that appear to have similar fact patterns but that hold for the insurer are
> actually cases where the loss was caused by the illness rather than the accident.  See,
> e.g., Crosswhite v. Reliance Standard Life Ins. Co., 259 F. Supp. 2d 911, 918-19
> (E.D. Mo. 2003) (applying ERISA) (stroke, not motor vehicle accident, was the
> immediate cause of death and is therefore excluded); Kolowski v. Metro. Life Ins.
> Co., 35 F. Supp. 2d 1059, 1064 (N.D. Ill. 1998) (applying Illinois law) (heart attack
> following stressful work and heavy lifting falls under policy exclusion for disease
> because it was the cause of death); State v. Arbuckle, 941 P.2d 181, 185 (Alaska
> 1997) (applying state law) (coverage excluded as the direct or indirect cause of death
> where heart attack occurred following heavy lifting).

Each of these cases either involved no accident or involved a situation where sickness or disease was
an independent cause of death, and the insured would have died regardless whether the injury
occurred.  See, e.g., Crosswhite v. Reliance Standard Life Ins. Co., 259 F. Supp. 2d 911, 918-19
(E.D. Mo. 2003)("[T]he evidence available to Reliance Standard when it reached its decision
was that Mr. Crosswhite's stroke, which began while he was driving, proved fatal, and that the collision,
while a condition contributing to the death, did not result in the underlying cause of death."); 
Kolowski v. Metro. Life Ins. Co., 35 F. Supp. 2d 1059, 1064 (N.D. Ill. 1998)(rejecting the plaintiff's
contention that, "while the decedent unquestionably died of a heart attack, that heart attack was, at
the very least, 'contributed' to by his 'unusual' working conditions just prior to the attack," where
the insured died approximately five days after preforming heavy lifting at work); State v. Arbuckle,
941 P.2d 181, 185 (Alaska 1997)(holding that a man who died of a heart attack while unloading a
truck was excluded, even though he "would not have died at the exact point in time that he did die
if he had not been doing the lifting that he was doing . . . .").

"[t]he fractured humerus standing alone did not cause Mr. Kassa's death." Response at 11. The import of the Tenth Circuit's caselaw interpreting substantively identical policy language, however, is that, where an accident, and not an illness, is the trigger that leads to the insured's hospitalization and death, the death is covered under the AD&D policy. Moreover, the Court believes that this conclusion is a reasonable and correct result in this case. Based on the evidence in the record, R. Kassa died as a direct and independent result of the accident. R. Kassa's cardiovascular disease played a role in his death, but that role depended on the accident. R. Kassa was at his "baseline state of health at the time of his fall and pursued his normal activities of daily living." Cline-Parhamovich Aff. ¶ 4.A, at 2. His cardiovascular disease was "controlled" with medication. Lewis' Records for R. Kassa at 6, 10, 13. The accidental physical injuries R. Kassa sustained in his fall "proximately set in motion the events, which resulted in Mr. Kassa's death on September 6, 2008." Cline-Parhamovich Aff. ¶ 4, at 3. Thus, the fall was the direct and independent cause of R. Kassa's death. His cardiovascular disease was a dependent cause; the exacerbation of his atherosclerotic and hypertensive cardiac disease was dependent on his injuries from the accident. But for the accident, R. Kassa would have remained at his baseline health level -- which included atherosclerotic and hypertensive cardiac disease that was not immediately fatal and did not independently cause his death. Only as a result of the injuries that R. Kassa's sustained in his fall did he die; his injuries independently triggered the events that lead to his death, thereby directly causing it. The Court therefore concludes that R. Kassa's death resulted from "bodily injuries . . . caused by an accident . . . which, directly and from no other causes, result in a covered loss," Group Accident Policy at 1, and R. Kassa's death is not excluded under the Sickness Exception.

The Defendants contend that the Tenth Circuit's opinion in Pirkheim v. First UNUM Life Insurance Co. supports their position. Pirkheim v. First UNUM Life Insurance Co. involved a young

boy with arrhythmia who died when his pacemaker battery became depleted:

> The significant facts are not in dispute.  Logan Pirkheim was born with a congenital heart defect.  At approximately eight months of age, Logan underwent heart surgery to correct the defect.  Although doctors successfully repaired the structural defects in Logan's heart, the surgery resulted in nerve damage, causing Logan to suffer an abnormal heart beat, or cardiac arrhythmia.  To correct this problem, the doctors implanted a pacemaker, which functioned properly after implantation.  A little over four years later, however, Logan began suffering from arrhythmic seizures (which the pacemaker was designed to prevent) and died.

> The cause of Logan's death was not immediately determined.  The original death certificate did not identify a cause of death and indicated an autopsy was pending.  After conducting an autopsy, the pathologist concluded, in relevant part, "*the cause of death was apparent pacemaker failure in this 5-year-old boy who was pacemaker dependent following repair of his congenital heart disease*."  (Emphasis added.)  After examining the pacemaker, the manufacturer's laboratory concluded:

>> *The tests show that the pacemaker was performing within all mechanical and electrical specifications for a unit at this stage.  The battery depletion analysis showed that the battery was depleted.  The tests show that the "Elective Replacement Indicator" as well as the "Intensified Follow-up Indicator" were triggered prior to the device going to "no-output."*

> (Emphasis added.)  In short, death was caused by the failure of the pacemaker, which in turn was caused by the battery becoming depleted.

229 F.3d at 1009.  The Tenth Circuit considered whether the death was covered under an AD&D group policy with similar language to the Group Accident Policy, requiring that "*[t]he loss must result directly and independently of all other causes from accidental bodily injury*."  229 F.3d at 1009 (emphasis in original).  The plaintiff filed an AD&D insurance claim, and the defendant "rejected his claim on the ground 'that death was not an accidental bodily injury direct and independent of all other causes.'"  229 F.3d at 1009.  The plaintiff appealed, and the defendant denied the appeal.  The district court granted summary judgment for the defendant, "concluding, as a matter of law, (1) the pertinent policy language is unambiguous, and (2) Logan Pirkheim's death 'did not result independently of all other causes;' therefore, 'the plan administrator did not err in

denying accidental death benefits to Mr. and Mrs. Pirkheim.' 229 F.3d at 1009.  Before addressing the key issue before it -- whether the doctrine of reasonable expectations applies when the insurance policy is unambiguous -- the Tenth Circuit affirmed the district court's ruling, stating, without additional analysis, that, "[b]ecause Logan Pirkheim's death did not occur independent of all other causes, *e.g.*, his cardiac arrhythmia, one of the two express policy conditions was not satisfied. Accordingly, [the Tenth Circuit] h[e]ld the plan administrator did not err in denying accidental death benefits to Mr. and Mrs. Pirkheim." 229 F.3d at 1011.

There appears to be some tension between the Tenth Circuit's opinion in Pirkheim v. First UNUM Life Insurance Co. and its later opinions in Johnson v. Life Investors' Insurance Co. and Kellogg v. Metropolitan Life Insurance Co.  The Court believes that Tenth Circuit's more recent and more detailed and throughly reasoned opinions counsel the Court how to deal with this case.  While the Tenth Circuit has not overruled its decision in Pirkheim v. First UNUM Life Insurance Co., it has not cited that case for support in its later caselaw addressing similar AD&D provisions, and recently distinguished Pirkheim v. First UNUM Life Insurance Co. when interpreting the term "accident" in a case interpreting "whether a wreck incurred by a drunk driver with a BAC of almost three times the legal limit is not unambiguously included within the ordinary and reasonable interpretation of 'accidental' death coverage."  LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan, 605 F.3d 789, 804 n.10 (10th Cir. 2010)("In Pirkheim v. First Unum Life Insurance Co., . . . this court held that the phrase 'directly and independently of all other causes from accidental bodily injury,' under the circumstances at issue there, was not ambiguous.  That case, however, is distinguishable from the case at issue here.").  Moreover, the facts of this case are more similar to the facts in Johnson v. Life Investors' Insurance Co. and Kellogg v. Metropolitan Life Insurance Co. than they are to the facts in Pirkheim v. First

UNUM Life Insurance Co. on two accounts: (i) like R. Kassa's controlled cardiovascular disease, the insured's diseases in the more recent cases were not otherwise immediately fatal independent of the accidental injuries; and (ii) the accidental injuries caused the insureds' hospitalization and death.   Unlike R. Kassa's heart condition in this case, the insured's seizure in Kellogg v. Metropolitan Life Insurance Co., and the insured's pneumonia and muscular dystrophy in Johnson v. Life Investors' Insurance Co., all three of which were not independently fatal, the depleted battery in Pirkheim v. First UNUM Life Insurance Co. allowed the fatal effect of the insured's cardiac arrhythmia to occur.  The accident did not aggravate or cause a disease that was not otherwise fatal. The child's cardiac arrhythmia was presumably a condition that would have proven fatal before, during, and after his accident.  The Court therefore follows the Tenth Circuit's more recent, fully reasoned, and factually analogous decisions, and concludes that R. Kassa's death is covered under the Group Accident Policy.

## II.   THE SPD DOES NOT ADEQUATELY REVEAL THE GROUP ACCIDENT POLICY'S DISCLAIMERS, AND THE BROADER LANGUAGE OF THE SPD CONTROLS COVERAGE IN THIS CASE.

The Court's conclusion that R. Kassa's death is covered under the Plan also accords with the statement in the SPD that the "AD&D pays a benefit if you are dismembered or die as a result of an accidental injury." SPD at 55.  Because the Court concludes that R. Kassa's death is covered under the narrower language of the Group Accident Policy, it also concludes that R. Kassa's death is covered under the broader language of the SPD.  Moreover, if R. Kassa's death did not satisfy the language of the Group Accident Policy requiring the death to result from "bodily injuries . . . caused by an accident . . . which, directly and from no other causes, result in a covered loss," Group Accident Policy at 1, or failed under the Sickness Exclusion, the Court would find that the SPD fails to disclose the Group Accident Policy's disclaimers, and therefore the SPD's broader language

would control.[6]  See Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d at 107 (stating

that, in an ERISA case, all ambiguities in a plan must be construed against the employer).

Pursuant to 29 U.S.C. § 1022(a):

A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title.  The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.  A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant . . .

29 U.S.C. § 1022(a).  Under § 1022(b), the "summary plan description shall contain . . . the plan's

requirements respecting eligibility for participation and benefits . . . [and] circumstances which may

result in disqualification, ineligibility, or denial or loss of benefits . . . ."  29 U.S.C.

§ 1022(b)(emphasis added).

The SPD makes no mention of the Sickness Exception or the requirement that the death

result "directly and from no other causes" than the accidental injury.  Group Accident Policy at 1.

The inside cover of the SPD, under a headline in large type stating "Important information about the

contents of this document," the SPD states it that "is intended to be only a summary of the major

highlights of" the various benefits plans that makeup the Plan.  SPD at i.  The last paragraph on that

same page states:

No general explanation can adequately give you all the details of the Plans.  This general explanation does not change, expand, or otherwise interpret the terms of the Plans.   If there is any conflict between the SPD, or any written or oral

---

[6] While the Court concludes that the language of the Group Accident Policy is unambiguous when viewed in isolation, the Court construes the documents as a whole.  The language of the SPD compared to the Group Accident Policy may create an ambiguity that the Court would construe in N. Kassa's favor.

communication by any individual representing the Plans, and the Plan documents (including any related insurance contracts), the terms of the Plan documents -- including any related insurance contracts as interpreted in the sole discretion of the Plan Administrator -- will be followed in determining your rights and benefits under the Plans.

SPD at i. This text does not state that the "the plan's requirements respecting eligibility for participation and benefits . . . [and] circumstances . . . may result in disqualification, ineligibility, or denial or loss of benefits . . . ." 29 U.S.C. § 1022(b). Moreover, to the extent that the Defendants intend this language to serve as a disclaimer, it is not clear and conspicuous. The text is not bolded or bordered; the paragraph is in regular type. The AD&D policy information appears fifty-five pages later, and there is no reference to these qualifications in the section addressing the AD&D coverage offered to plan participants. Therefore, the wording that the SPD "does not change, expand, or otherwise interpret the terms of the Plans," and does not reasonably inform an average plan participant that the AD&D insurance has limitations or exclusions which have not been disclosed to the participant in the SPD. Specifically, stating that "[n]o general explanation can adequately give you all the details of the Plans" does not adequately alert a Plan participant that the coverage under the Group Accident Policy is significantly narrower than the description in the SPD. The SPD's statement that the "AD&D pays a benefit if you are dismembered or die as a result of an accidental injury," SPD at 55, does not suggest that the "accident . . . [must] directly and from no other causes, result in a covered loss," or that, as the Defendants argue, "sickness, disease, or bodily infirmity" must play no role in the death, Group Accident Policy at 1.

    In contrast to the unqualified statement in the AD&D section that the "AD&D pays a benefit if you are dismembered or die as a result of an accidental injury," SPD at 55, the SPD description of the long- and short-term disability coverage specifies that qualifications and exclusions apply. The language in the disability benefits section states: "The receipt of STD and LTD benefits is

subject to the terms and conditions of the applicable Plan.  For related benefit offsets, exclusions and limitations, <u>see</u> the Plan document at www.benefitsbookonline.com and the insurance certificate. This section is not intended to be a substitute for the actual Plan documents."  SPD at 15.  The express limitation in one section, which is absent from the AD&D, would further lead a Plan participant to reasonably believe that the AD&D coverage is not significantly limited in the Group Accident Policy.  Thus, were the Court to conclude that R. Kassa's death is not covered under the Group Accident Policy, it would conclude that the SPD's language controls, and because the Court credits Dr. Cline-Parhamovich's account of the cause of R. Kassa's death as resulting from his injuries, the Court would determine that he "die[d] as a result of an accidental injury." SPD at 55.

**IT IS ORDERED** that the request for relief in the Plaintiff's Brief in Chief, filed February 21, 2011 (Doc. 30), is granted, and the Court orders the Defendants to pay Plaintiff Nikki Kassa $30,000.00, pre- and post-judgment interest, attorneys' fees, and costs.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Charles R. Finley
Warner & Finley
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Kristina Martinez
Holland & Hart, LLP
Santa Fe, New Mexico

-42-

-- and --

Jack M. Englert, Jr.
Holland & Hart, LLP
Greenwood Village, Colorado

*Attorneys for the Defendants*